# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE CITY DIVISION

In re:

**PREMIER BANK HOLDING COMPANY,**                    Case No. 12-40550-KKS
                                                     Chapter 11

**Debtor.**

_____/

## HILDENE DEBT SOLUTIONS, INC.'S MOTION FOR LEAVE TO APPEAL ORDER DENYING HILDENE DEBT SOLUTIONS, INC.'S MOTION FOR AN ORDER AUTHORIZING AND DIRECTING EXAMINATION OF THE DEBTOR AND OTHERS PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (DOC. 176)

### INTRODUCTION

Pursuant Federal Rule of Bankruptcy Procedure 8003(a), Hildene Debt Solutions, Inc. ("Hildene"), a trust preferred securities ("TruPS") holder and creditor of the Debtor in the above-captioned matter, hereby files this motion for leave to appeal the Bankruptcy Court's March 18, 2013 Order (Doc. 176) (attached as Exhibit A) denying its Motion for an Order Authorizing and Directing Examination of the Debtor and Others Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.

Under Federal Rule of Bankruptcy Procedure 8003(a), "a district court may grant interlocutory review of a bankruptcy order if the subject issue (1) involves a controlling question of law, (2) as to which there is a substantial ground for difference of opinion, and (3) is such that an immediate appeal would advance the ultimate termination of the litigation." In re Pac. Forest Products Corp., 335 B.R. 910, 919 (S.D. Fla. 2005).

> The District Court is bound by the findings of fact made by the Bankruptcy Court unless it determines them clearly erroneous. The burden is on the appellant to show that the Bankruptcy Court's factual findings are clearly erroneous.

Appellant is entitled to an independent, de novo review of all conclusions of law and the legal significance accorded to the facts.

In re Lykes Bros. S.S. Co., Inc., 200 B.R. 933, 938-39 (M.D. Fla. 1996)(internal citations omitted).

# I.

## Statement of Facts Necessary to an Understanding of the Questions to Be Presented on Appeal

Hildene sought an Order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure authorizing and directing discovery of the Debtor Premier Banking Holding Company (the "Debtor" or "PBHC"), its advisor Sandler O'Neill + Partners, L.P. ("Sandler"), and Home BancShares, Inc. ("BancShares" or the "Purchaser"), the purchaser of the Debtor's sole substantial asset, Premier Bank, Tallahassee, Florida ("Premier" or the "Bank"), which was merged into BancShares's subsidiary, Centennial Bank as a consequence of a § 363(b) sale approved by the Bankruptcy Court on November 29, 2012.

Hildene sought the production of relevant documents and depositions of certain individuals in order to determine whether a derivative action on behalf of the Debtor's estate against the Debtor's Officers and Directors was appropriate for breach of fiduciary duty on account of their self-dealing and failure to disclose conflicts of interest.

The Debtor's Officers and Directors initiated a voluntary bankruptcy filing that resulted in the § 363(b) sale of Premier to BancShares for the sum of $1.415 million. As a result, the Debtor's creditors, which include holders of $13.2 million of TruPS and the U.S. Taxpayer, through $9.7 million in TARP, were virtually wiped out and will only recover cents on the dollar.

The Debtor's Officers and Directors rejected a restructuring proposal offered in part by the parent of the movant, Hildene Capital Management, LLC, which would have preserved nearly $14 million in deferred tax assets, resulting in a far better outcome for the creditors.

Although the Debtor argued to the Bankruptcy Court that there were no viable alternatives other than the § 363(b) sale of Premier to BancShares because no other purchasers or investors made an offer, the credibility of this assertion is dubious in light of information that surfaced after the Bankruptcy Court approved the § 363(b) sale on November 29, 2012.

*__First__*, there is strong evidence that, contrary to representations that the Debtor made to the Bankruptcy Court, the Debtor failed to provide the kind of information in its "data room" that would have enabled any credible investor to evaluate Premier as a potential investment opportunity. One of these potential investors was Resource Financial Institutions Group, Inc. ("RFIG"), a private equity fund that manages $14.9 billion of assets in various alternative investments, including over $4 billion in trust preferred securities and private equity investments in U.S. banks and other financial companies. RFIG stated in a letter accompanying Hildene's Rule 2004 motion that, based on its review, Premier's data room "contains insufficient information to enable many investors to provide a bid" and that the data room's "deficiencies … limit the market and probably impact the consideration available to holding company stakeholders.[1]" These assertions by an active and significant market participant indicate that, in spite of its protestations to the contrary, the Debtor did not discharge its fiduciary duty to its creditors in terms of taking the appropriate measures to secure the best offer, which would have included making available a current third party loan review of Premier's loan portfolio. According to RFIG, "every bank that has been successfully recapitalized since the credit crisis

---

[1] Letter from Shivan Govindan to Hon. Karen Specie (December 27, 2012).

had a third party loan review available for potential investors." Here, the Debtor did not make a third party loan review available for potential investors, rendering its data room nearly useless. It is thus unsurprising that no competitive bids materialized.

**_Second_**, the Debtor's President and CEO, G. Matthew Brown ("Brown"), who was also Premier's President and CEO, misrepresented to the Bankruptcy Court his job prospects with the Purchaser in order to conceal the fact that he would benefit personally from the § 363(b) sale. Specifically, on December 1, 2012, Brown was featured in a press release issued by BancShares as the "Tallahassee Market President for Centennial Bank." Brown moved directly into this job from his role as President and CEO of Premier. Yet, in his testimony before the Bankruptcy Court on September 6, 2012, Brown testified that he had "an informal arrangement that they would like for me to join them in a local market position, but there is no agreement between us, and there is no contract or employment agreement contemplated." (Sept. 6, 2012 Tr. at 147). And on November 27, 2012, at the final hearing before the Bankruptcy Court approved the § 363(b) sale on November 29, 2012, Brown proffered testimony through counsel, which the Bankruptcy Court accepted, in which he testified that "other than the APA … and the APA amendment … **_there are no other deals, arrangements or agreements of any kind whatsoever between the purchaser and any of the debtors insiders, shareholders or any other party, including himself_**."[2] (Nov., 27, 2012 Tr. at 15) (emphasis added).

In light of his immediate hiring by Centennial Bank following the Court's approval of the § 363(b) sale, the credibility of Brown's November 27 testimony is highly suspect, especially considering that BancShares claimed publicly during the fall of 2012 that part of its rationale for

---

[2] There was nothing in the APA or the APA amendment that addressed Brown's job prospects.

acquiring Premier was driven by the prospect of employing Premier's management team. Moreover, BancShares's CEO also stated publicly that the Debtor's liability to TruPS holders and to TARP would have made the deal impossible. Thus, it appears that the deal was structured, with the Debtor's participation and at a time the Debtor owed a fiduciary duty to the creditors, to eliminate the creditors's interests.[3]

In all likelihood, in his final effort to persuade the Bankruptcy Court to approve the § 363(b) sale, Brown denied the existence of any job prospects with BancShares in order to avoid raising any red flags that his own job prospects motivated his decision to proceed with a § 363(b) sale rather than the alternative structure that was more protective of creditors but which might have resulted in him losing his job.

Based on the new information concerning the data room's material inadequacy, combined with the flatly incredible testimony that Brown proffered on November 27, Rule 2004 discovery should have be allowed to proceed so that the creditors could determine whether Brown acted to secure a soft-landing for himself and limit the likelihood that any offers competitive to the one made by BancShares would ever materialize.

---

[3] John W. Allison, BancShares's Chairman, explained BancShares's rationale for acquiring Premier on BancShares's October 18, 2012 Q3 2012 Earnings Call as follows: "Mostly problem banks and you have to get in them just like we did Tallahassee. It wouldn't work. That deal wouldn't work with Trust Preferred and TARP. It just wouldn't work. So it – sorry, it didn't work. It will work, we can make it work, but the only reason it works for us is because it doubles our size in that market. We pick up some good management. We pick up lots of talent in that market. Their branches are little nicer than our branches. So there was more to that transaction than just the profit. Had it just be (*sic)* a price transaction and somebody new coming in, the Tallahassee to try to do that transaction, it wouldn't work. So you got to look at your footprint. We got a lot of management on the ground in the Panhandle Florida. So when an opportunity comes up in the Panhandle Florida, it's not as expensive for us to increase our size there because we got people on the ground." Home BancShares, Inc. Q3 2012 Earnings Call Transcript at 12 (Oct. 18, 2012).

Despite the fact that the Bankruptcy Court approved the § 363(b) sale based on potentially false testimony, the Bankruptcy Court nonetheless denied with prejudice Hildene's Rule 2004 motion as against Sandler and BancShares. The Bankruptcy Court denied the motion without prejudice as to the Debtor PBHC, but severely limited the permissible scope of the Rule 2004 discovery and also imposed requirements not found in Rule 2004 or the case law interpreting the statute as a pre-condition for Hildene to even obtain that discovery.

Specifically, the Bankruptcy Court ordered that it would require Hildene to: (a) establish that it had standing to seek Rule 2004 discovery (even though the Debtor did not object to Hildene's standing to do so) and (b) establish that it was seeking the Rule 2004 discovery in "good faith." Further, the Bankruptcy Court held that any examination of PBHC would be limited to examining Brown and whether his November 27 testimony was truthful and events related to that testimony that occurred after the November 27 hearing, but not for purposes of questioning the § 363(b) sale itself. The Court finally held that it would conduct an evidentiary hearing to determine whether Hildene met its pre-conditions to even conduct Rule 2004 discovery. *See* Doc. 176.

## II.
## Statement of Issues on Appeal and Relief Sought

The issues on appeal are (a) whether the Bankruptcy Court inappropriately imposed pre-conditions on Hildene's motion to conduct Rule 2004 discovery, including: (i) requiring that Hildene establish standing to pursue Rule 2004 discovery and (ii) requiring Hildene to establish its "good faith" in order to proceed with Rule 2004 discovery; (b) whether the Bankruptcy Court improperly limited the examination of PBHC to solely examining Brown regarding whether he

misrepresented facts to the Bankruptcy Court on November 27, 2012, and then, further limiting the use of that testimony to events that occurred after November 27, 2012, but not to questioning in any respect the rationale for the § 363(b) sale itself; and (c) whether the Bankruptcy Court inappropriately blocked any Rule 2004 discovery of Sandler and BancShares, which would have been pertinent to whether the Debtor breached its fiduciary duty to the creditors.

As for relief, Hildene seeks a reversal of the Bankruptcy Court's March 18, 2013 Order, and an Order from the District Court that it may take the full scope of Rule 2004 discovery that it sought in the first instance to determine whether the Debtor breached its fiduciary duty to the estate's creditors, without any of the pre-conditions or limitations imposed by the Bankruptcy Court.

## III.

## Statement of Reasons Why the Appeal Should be Granted

Hildene's motion for leave to appeal should be granted because the Bankruptcy Court committed fundamental errors of law in: (a) establishing extra-statutory prerequisites for Hildene to proceed with Rule 2004 discovery; and (b) barring Hildene from examining the Debtor's CEO's motivations in presenting potentially perjured testimony in an effort to persuade the Bankruptcy Court to approve a § 363(b) sale.

### A.    The Bankruptcy Court Established Extra-Statutory Prerequisites to Rule 2004 Discovery

The Bankruptcy Court's Order concerning the prerequisites that Hildene must establish for even obtaining Rule 2004 discovery at an evidentiary hearing involves a question of controlling law.  Essentially, the Bankruptcy Court created prerequisites to Rule 2004 discovery that are not found in the statute or the case law interpreting the statute.

*First*, there is no requirement in Rule 2004 that Hildene establish its standing to proceed. Moreover, and notably, none of the parties objected to Hildene's standing to proceed with Rule 2004 discovery, and PBHC advised the Bankruptcy Court on March 14, 2013 at the non-evidentiary hearing on Hildene's Rule 2004 motion that it had never raised any objection to Hildene's standing. (March 14, 2013 Tr. at 26-27)  Rather, the Bankruptcy Court seemed to accept an argument that PBHC advanced that Hildene had no right to complain and make a "collateral attack" on the § 363(b) sale of Premier Bank to BancShares by using a Rule 2004 motion, because it could have made an objection prior to the Bankruptcy Court's approval of the sale.

However, up until November 30, 2012, Hildene's parent, Hildene Capital Management, LLC ("HCM"), though one of the funds it managed, owned an interest in an investment vehicle, Alesco Preferred Funding XII, Ltd., which in turn owned at least some of PBHC's TruPS.  Thus, neither HCM nor any entities it controlled had any legal standing or right to intervene in this bankruptcy case, notwithstanding its good faith efforts to persuade PBHC to consider alternatives to the § 363(b) sale.

Indeed, in a different matter, In re AmericanWest Bancorporation, No. 10-06097-PCW11, 2011 WL 6013779 (Bankr. E.D. Wash. Dec. 2, 2011), which involved a bank holding company that filed under Chapter 11 of the Bankruptcy Code and sought to effectuate a § 363 asset sale of its bank subsidiary, HCM objected to the debtor's motion to establish bidding procedures. In that case, HCM (through one of the funds it managed) was an investor in several of the trusts holding the TruPS issued by the debtor. The debtor responded by moving to remove HCM from the bankruptcy case on the grounds that it lacked the standing necessary to be involved in the case.  The Bankruptcy Court there approved the bidding procedures and held that

HCM lacked standing to participate as a party in interest in the Chapter 11 case. The Court determined that HCM's pecuniary interest or potential for economic harm as a result of the reorganization of the debtor was too attenuated and indirect for it to have acquired legal standing to object. (*See* Oral Ruling of the Court, attached as Exhibit B, at 5-6).

Due to the manner in which it held PBHC's TruPS, HCM was in the same situation with regard to its investment in PBHC at the time of the petition date here as it was in <u>In re AmericanWest Bancorporation</u>. In light of the Bankruptcy Court's holding regarding standing in <u>In re AmericanWest Bancorporation</u>, HCM believed in good faith that any application to intervene in this case would yield the same result, i.e., dismissal of any application due to lack of standing. Accordingly, HCM started the process of securing direct ownership of PBHC's TruPS in late September or early October, 2012. The process was a complicated one, and involved a complex negotiation, which resulted in a contractual agreement between HCM's subsidiary, Hildene, and The Bank of New York, which was not finalized until November 30, 2012 (*see* Doc. 152, Exhibit B). Accordingly, Hildene did not acquire a direct ownership interest in PBHC's TruPS until after the Bankruptcy Court here had approved the sale and thus could not have intervened earlier as a matter of law.

Thus, the Bankruptcy Court's purported concern at the non-evidentiary hearing on the Rule 2004 motion on March 14, 2013 that Hildene's purchase of the TruPS directly was inappropriate in order to gain standing is unfounded. As the Court held in <u>In re DBSD North America, Inc.</u>, 634 F.3d 79, 102 (2d Cir. 2011) in connection with a determination of whether a creditor's votes should be designated, "Merely purchasing claims in bankruptcy, "for the purpose of securing the approval or rejection of a plan does not of itself amount to 'bad faith.'" Likewise here, Hildene cannot be faulted for trying to obtain direct standing as a creditor, which it

obtained on November 30, 2012, and thus the Bankruptcy Court should not have required Hildene to establish standing independently, as a prerequisite to its Rule 2004 motion.

Thus, there is also a substantial ground for difference of opinion, because the Bankruptcy Court's Order requiring Hildene to establish standing is simply not found in any authority. Finally, the determination of this appeal will materially advance the ultimate termination of this litigation. A decision on the authority of the Bankruptcy Court to order a party to establish standing will preclude the need for further appeals of this type, which delay the bankruptcy proceedings.

***Second***, the Bankruptcy Court committed legal error by requiring Hildene to establish that it had "good faith" in seeking the Rule 2004 discovery. Rule 2004 contains no such requirement. While the movant seeking Rule 2004 relief must establish "good cause" if the application is opposed, *see* In re Youk-See, 450 B.R. 312, 319-20 (Bankr. D. Mass. 2011)("An entity contesting a Rule 2004 examination generally files a motion to quash or a motion for a protective order, which shifts the burden to the party seeking an examination to show "good cause" for the examination to proceed), there is nothing in the law that requires the "good faith" showing that the Bankruptcy Court imposed for the Rule 2004 discovery.

The Bankruptcy Court seems to have grafted onto Rule 2004 a "good faith" requirement that exists elsewhere in bankruptcy law. *See e.g.*, In re 15375 Mem'l Corp. v. Bepco, L.P., 589 F.3d 605, 618 (3d Cir. 2009)("Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish [good faith]. Whether the good faith requirement has been satisfied is a fact intensive inquiry in which the court must examine the totality of facts and circumstances and determine where a petition falls along the spectrum ranging from the clearly acceptable to the patently

abusive. We focus[ ] on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage." (internal quotations and citations omitted)).

However, the Bankruptcy Court did not reference any cases in which a "good faith" requirement also existed regarding Rule 2004, nor did any of the parties against whom Rule 2004 discovery was sought. Thus, for the same reason that the Bankruptcy Court's ruling regarding standing should be reviewed now, so should its Order requiring Hildene to establish "good faith."

**B.     The Bankruptcy Court's Order Effectively Excuses Perjury**

The Bankruptcy Court's Order limiting the scope of any Rule 2004 examination of the Debtor and other key parties (i.e., BancShares and Sandler) raises a significant issue of law. The issue is whether Rule 2004 discovery cannot be taken in order to examine a debtor's motives to commit perjury to secure the Bankruptcy Court's approval of a § 363(b) sale. Here, the Bankruptcy Court effectively concluded as a matter of law that even perjured testimony that was specifically intended to secure its approval of a § 363(b) sale could not be used as a basis to examine the debtor's motivations in proffering that testimony.

The Debtor effectively conceded that Brown, on November 27, 2012, made a deliberate misrepresentation to the Court. That misrepresentation was contained in his testimony that was proffered, and which the Bankruptcy Court accepted, in order to persuade the Court to grant PBHC's motion to allow the § 363 sale of Premier Bank to BancShares. Specifically, PBHC failed in its filings in the Bankruptcy Court to rebut, at all, Hildene's arguments (Doc. 146 ¶¶ 37-41, 44) concerning Brown's testimony on November 27 that he had no arrangement of any kind with BancShares, when just a few days later BancShares announced (on December 1) that Brown

was the new Centennial Bank Market President for the Tallahassee. This material information, which only came to light after the Bankruptcy Court approved the sale on November 29, 2012, suggests strongly that Brown was not forthright in his November 27 testimony. Rather than address this issue, however, PBHC simply ignored it altogether in briefs filed in the Bankruptcy Court, thereby essentially admitting that Brown misled the Court.

Based on Brown's misrepresentation, the Bankruptcy Court should have allowed the Rule 2004 discovery to proceed so that Hildene could determine whether PBHC's creditors could pursue breach of fiduciary duty claims against the Debtor's officers and directors.

At oral argument on March 14, 2013, the Debtor's counsel argued to the Bankruptcy Court that "the testimony from Mr. Brown at the sale hearing was that there was no arrangement, no contract, no deal of any kind with the buyer. That was true then. It is true today. He has no contract with HBI. He is an at-will employee." (March 14, Tr. at 24).

However, despite PBHC's retrospective efforts to say that Brown did not lie by claiming all he was offered by BancShares was an "at will" job at a reduced pay rate, the fact of the matter is that on November 27, 2012 he disclaimed in his sworn testimony ***any*** relationship or arrangement of ***any*** kind with BancShares (contrast that to his September 6 testimony when he testified that he had an informal "arrangement"). Under Florida law, however, an "at will" employment relationship is deemed a contractual relationship. *See* <u>Knight v. Palm City Millwork and Supply Co.</u>, 78 F.Supp.2d 1345 (S.D. Fla. 1999). Accordingly, no matter its contention that an "at will" employment relationship is not an arrangement or a contract, under Florida law, an "at will" employment relationship is not only an arrangement, but it is in fact a ***contract***. PBHC and Brown cannot escape from Brown's misrepresentation by claiming that an

"at will" employment relationship has no legal significance, which is what they are attempting do.

To further buttress this point, Hildene refers the Court to a letter dated March 20, 2013 from Debtor's counsel (attached as Exhibit C), in which he threatened to seek sanctions if Hildene continued in its efforts to obtain Rule 2004 discovery. In that letter, counsel indicated that Brown at all times contemplated joining BancShares. This fact alone is proof that Brown lied on November 27 when he denied having any relationship with BancShares, because under Florida law an at-will employment relationship is a contract.

Hildene was thus well within its rights to seek discovery concerning Brown's misrepresentation and the motivations for it. However, the Bankruptcy Court, apparently not wanting anything to disturb its Order allowing the § 363 sale of Premier Bank to BancShares, refused to allow Hildene to inquire into Brown's motivations to lie in a final effort to persuade the Court to allow the sale. Instead, it allowed a narrow and cramped inquiry for purposes that would have no value to the estate.

Thus, the Bankruptcy Court's ruling raises a fundamental and unique issue of law. It would certainly be material in concluding this litigation and all others if it were made clear that perjured testimony would offend all traditional principles of justice and that a debtor's motivations to lie to induce a bankruptcy court to approve a § 363(b) sale is an area of fair inquiry for a Rule 2004 examination. An immediate appeal is necessary so as to avoid a miscarriage of justice here.

## CONCLUSION

For the forgoing reasons, Hildene respectfully requests that the Court allow its motion for leave to appeal.

Dated this 28th day of March, 2013.

Respectfully submitted,

/s/ Ethan A. Brecher
**ETHAN A. BRECHER**
Law Office of Ethan A. Brecher, LLC
600 Third Avenue, 2nd Floor
New York, NY 10016
Phone: (646) 571-2440
Fax: (888) 821-0246
Email: ethan@ethanbrecherlaw.com
Attorney for Hildene Debt Solutions, Inc.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE CITY DIVISION**

**In re:**

**PREMIER BANK HOLDING COMPANY,**                    Case No. 12-40550-KKS
                                                      Chapter 11

                        **Debtor.**
_____/

## HILDENE DEBT SOLUTIONS, INC.'S CERTICIATION OF CONFERRAL WITH COUNSEL REGARDING PROPOSED MOTION FOR LEAVE TO APPEAL

1. I, Ethan A. Brecher, attorney for Hildene Debt Solutions, Inc., hereby certify that pursuant to Local Rule 7007-1.A of the United States Bankruptcy Court for the Northern District of Florida, I notified all counsel regarding Hildene's intent to file a Motion for Leave to Appeal the Bankruptcy Court's Order Denying Hildene Debt Solutions, Inc.'s Motion for an Order Authorizing and Directing Examination of the Debtor and Others Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.

2. Counsel did not come to any agreement regarding the proposed motion.

Dated this 28th day of March, 2013.

Respectfully submitted,

/s/ Ethan A. Brecher
**ETHAN A. BRECHER**
Law Office of Ethan A. Brecher, LLC
600 Third Avenue, 2nd Floor
New York, NY 10016
Phone: (646) 571-2440
Fax: (888) 821-0246
Email: ethan@ethanbrecherlaw.com
Attorney for Hildene Debt Solutions, Inc.

**<u>Certificate of Service</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to all parties who have requested notice via electronic filing this 28th day of March 2013.

/s/ Ethan A. Brecher                
**Ethan A. Brecher**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

In re:

PREMIER BANK HOLDING COMPANY,        CASE NO.: 12-40550-KKS
                                           CHAPTER: 11

        Debtor.

_____/

## ORDER DENYING HILDENE DEBT SOLUTIONS, INC.'S MOTION FOR AN ORDER AUTHORIZING AND DIRECTING EXAMINATION OF THE DEBTOR AND OTHERS PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (DOC. 146)

THIS CAUSE came before the Court for hearing on due and sufficient notice to all parties in interest March 14, 2013 upon the Motion of Hildene Debt Solutions, Inc. ("Hildene") for an Order Authorizing and Directing Examination of the Debtor and Others Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Motion," Doc. 146) and the objections filed by the Debtor and others. Appearing at the hearing were counsel for: the Debtor; Hildene Debt Solutions, Inc; HomeBanc Shares, Inc.; Sandler O'Neill & Partners, L.P.; Wilmington Trust Company; the Department of Treasury; the Florida Office of Financial Regulation; U.S. Bank, National Association; and the United States Trustee. After review of the pleadings and having heard argument of counsel, it is

ORDERED:

1) The Motion is DENIED WITH PREJUDICE as to Sandler O'Neill & Partners, L.P.

2) The Motion is DENIED WITH PREJUDICE as to Home BancShares, Inc.

3) The Motion is DENIED WITHOUT PREJUDICE as to the Debtor on a limited basis, as specifically set forth in this Order.

4) In its Motion and at the March 14 hearing, Hildene alleges and argued that events that transpired after the final 11 U.S.C. § 363(b) sale hearing on November 27, 2012, specifically the issuance

of a Press Release dated December 1, 2012, by the Purchaser of the Debtor's assets (Doc. 146, Ex. E), was an indication of or "proof" that testimony of the Debtor's President, Mr. G. Matthew Brown ("Mr. Brown"), proffered at the sale hearing, may not have been truthful. Neither Hildene nor any other party in interest questioned the proffer of Mr. Brown's testimony at the final sale hearing or cross-examined Mr. Brown. Hildene may not now attack the § 363(b) sale, which is final and has closed.

5) In its Motion, Hildene asserts that cause(s) of action may exist in favor of the Bankruptcy Estate for the benefit of creditors as a result of Mr. Brown's current employment by Centennial Bank, which Hildene asserts is contrary to Mr. Brown's proffered testimony at the November sale hearing (Motion, page 1). For the reasons stated at the March 14 hearing, Hildene may file a renewed motion for a Rule 2004 examination of the Debtor for the sole and exclusive purpose of questioning Mr. G. Matthew Brown regarding his proffered testimony given on November 27, 2012 (Doc. 146, Ex. D, Pg. 3, Lines 15-19) and events pertaining or related to that testimony that may have occurred after the November 27, 2012 sale hearing. In any renewed motion for Rule 2004 Examination of the Debtor, Hildene must address its standing to such discovery, and why its request for such discovery is in a good faith pursuit of potential assets of this Estate, rather than an attempt to attack the § 363(b) sale. If Hildene Debt Solutions, Inc. files a renewed motion seeking a Rule 2004 Examination of the Debtor pursuant to this Order, the Court will conduct an evidentiary hearing to consider the renewed motion.

DONE and ORDERED in Tallahassee, Florida this 18th day of March, 2013.

KAREN K. SPECIE
United States Bankruptcy Judge

cc: all parties in interest

2

1    UNITED STATES BANKRUPTCY COURT

2    EASTERN DISTRICT OF WASHINGTON
     _____

3
     In Re:                        )
4                                  )
                                   )    No. 10-06097-PCW11
5    AMERICANWEST BANCORPORATION,  )
                                   )    Spokane, Washington
6              Debtor.             )
                                   )    November 18, 2010
7                                  )
                                   )    **ORIGINAL**
8                                  )
     _____

9
                     COURT'S ORAL RULING
10
           BEFORE THE HONORABLE PATRICIA C. WILLIAMS
11                        PRESIDING

12      STANDING ISSUE: HILDENE CAPITAL MANAGEMENT

13   APPEARANCES:

14
     For Debtor:                     MR. G. LARRY ENGEL
15                                   MS. ALEXANDRA BORRAGE

16   For SKBHC Hawks Nest Acquisition
       Corp., SKBHC Holdings, LLC:   MR. RAGAN L. POWERS
17                                   MR. VAN C. DURRER, II

18   For Hildene Capital Management,
       LLC:                         MR. THOMAS T. BASSETT
19                                   MR. CHARLES A. DALE, III

20
     For Wilmington Trust Company TRPS:  MR. J. WILLIAM BOONE
21

22   For U.S. Bank National Association
       as Indenture Trustee:        MR. IRA H. GOLDMAN
                                     MR. P.J. GRABICKI
23
                 **SHERRIE T. WRIGHT, TRANSCRIBER**
24                   **2129 E MARSHALL AVENUE**
                     **SPOKANE WA 99207**
25                   **509-953-4804**

                            1

2          THE CLERK:  This is the time set on AmericanWest

3     Bancorporation, Chapter 11, case number 10-6097.  This is

4     the time set on the court's oral decision on the standing

5     issue re Hildene Capital Management.

6          Present we have for the debtor, Larry Engel, and

7     Alexandra Borrage; for SKBHC Hawks Nest Acquisition, Ragan

8     Powers, and Van C. Durrer, II; for Hildene Capital

9     Management, Tom Bassett and Charles Dale, III; for the

10    Wilmington Trust Company, J. William Boone; for U.S. Bank

11    National Association, P.J. Grabicki, and Ira Goldman.

12         Judge Williams is on the line.

13         THE COURT:  Well, good morning, everyone.

14         UNIDENTIFIED SPEAKER:  Morning.

15         UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

16         UNIDENTIFIED SPEAKER:  Morning, Your Honor.

17         UNIDENTIFIED SPEAKER:  Morning.

18         THE CLERK:  This hearing is being recorded.  I would

19    ask that the parties please announce their name prior to

20    speaking and you may proceed.

21         THE COURT:  All right.  Before I commence rendering my

22    oral decision, I want everybody on the line to pick up a

23    pencil and paper.  We're going to do this the old fashioned

24    way.  We need to address a housekeeping matter.

25         We have a hearing at 2:00 today, and we have had some

requests of those who do not wish to participate by
speaking, but simply wish to listen, that they be able to
attend telephonically.  We are happy to honor those
requests.  This is the toll free number which those parties
who are just listening need to call.  It's 1-888-273-3658.
You will need an access code, that's 5423885.

We'll have the line open during the in court hearing.
If there are background noises that start to interfere with
the hearing, we won't have any option but to disconnect the
line.  So, I'm just cautioning everybody, you know, don't
put it on hold so we get music, don't start having
conversations in the background.  That would necessitate us
having to disconnect, and we certainly would try to avoid
that if we could.  So, that's at 2:00 o'clock today.

All right.  Now, let's get to the purpose of today's
get together, and that's the oral decision to determine
whether Hildene is a party in interest.  I will not review
the facts that are relevant to this controversy.

The facts have been set forth in the declaration of
Resnick, Docket 3, the declarations of Keen, Docket 53 and
120, and the declaration of Scannel (phonetic), Docket No.
45.  Those declarations and the short summaries of facts in
the memos of authority of both parties were very valuable.
The short summaries certainly I think assist in
understanding the basis-- or the basic structure of these

1    transactions.

2         So, the issue today is whether Hildene and similarly

3    situated parties are parties in interest as that term

4    appears in 11 USC 1109(b) and other sections of the code.

5    I'm referring to Hildene simply for ease of reference.

6    Since this standing issue was first raised, two other

7    entities, Zion First National and Deutsche Bank, which are

8    similarly situated to Hildene filed pleadings which also

9    raises a standing issue as to those entities.

10        The status of these three entities must be resolved on

11   an expedited basis due to the hearing later today, the

12   result of which will have a great impact upon the bankruptcy

13   proceeding.  So, all of the counsel are to be commended for

14   the quality of their submissions and arguments in view of

15   the time constraints imposed.

16        1109(b) does not define a party in interest, although

17   it provides examples of such.  In considering whether an

18   entity is a party in interest, the burden of demonstrating

19   that status is on the party alleging the status.  The

20   determination must be made upon a case by case basis and is

21   dependent upon the facts and circumstances of each

22   bankruptcy proceeding, and the relationship of the parties.

23        The term party in interest is to be broadly

24   interpreted, so that all those who have a direct pecuniary

25   interest will be able to participate in the bankruptcy

                              4

process.  In making the decision, I have relied upon all of the cases cited in the memos of authority.  The Amatex (phonetic) case and the Riverbend (phonetic) decisions were of little assistance and are only marginally relevant to the situation presented in this case.

The Ionosphere Club's case provided some general principles.  The analysis contained in the Second Circuit Rescoe (phonetic) decision was of great assistance, even though that decision involves standing to object to a settlement agreement, rather than standing to participate in a sale of the debtor's assets, which is the present situation.

The ultimate question is whether Hildene's pecuniary interest or the potential economic harm which could be suffered by Hildene is remote or indirect in relationship to the debtor's reorganization.  In the Grand Union case, the bankruptcy court allowed holders of notes issued by the parent of the debtor to appear and be heard.  Those note holders had no direct relationship with the debtor.

Hildene is even further removed from this debtor than were those note holders.  If Hildene were allowed to appear and participate in this bankruptcy proceeding, it would be as though the Grand Union court granted creditors of the note holders standing to appear in the bankruptcy.  Hildene is not a creditor or investor of the debtor.  It is not a

10-06097-PCW11    Doc 140    Filed 11/27/10    Entered 11/27/10 08:18:00    Pg 5 of 9

creditor of a creditor of the debtor, nor is it an investor
of an investor of the debtor.

It is a creditor of a creditor of a creditor of the
debtor. Its interest is not just remote from the debtor, it
is peripheral to the debtor. There is no statutory basis
for allowing such an indirect interest to participate in a
bankruptcy proceeding.

There are also other factors which are applicable. It
is highly questionable whether under the terms of the
investment vehicle in which Hildene participated that
Hildene has authority to advocate any position in this
bankruptcy. The investment structure and instruments
concerning Hildene and the other similarly situated
investors contemplate that their voices are to be heard
through the indentured trustee, Bank of New York.

It is the indentured trustee, Bank of New York, which
has the authority to deal, not with the debtor, but with the
indentured trustees, Wilmington and U.S. Bank which, in
turn, deal with the debtor. Hildene cannot by itself, or
even acting in concert with Zion National and Deutsche Bank,
direct Bank of New York to take any action or to specify
what action should be taken by Bank of New York. Although,
Hildene complains that under the notice provisions of the
investment vehicles there is insufficient time for Bank of
New York to provide required notices to entities, such as

6

1  Hildene, and that there is insufficient time for Bank of New
2  York to receive direction and take action as directed by
3  those in Hildene's position, that situation is caused by the
4  term of the investment vehicle and the structure of the
5  investments themselves.  It is not caused by the bankruptcy
6  filing.

7       Allowing such remote parties as Hildene to participate
8  in the bankruptcy proceeding would substantially interfere
9  with the purpose of bankruptcy, which is to provide an
10 efficient and timely reorganization of the debtor, or in
11 this case, a sale of assets.  Due to the structure of the
12 investments, the debtor cannot even identify the persons or
13 entities which would be similarly situated to Hildene.  Most
14 likely there would be hundreds or perhaps even thousands of
15 such entities.  Allowing such participation would overburden
16 the bankruptcy process and would interfere with the
17 administration of the case.  Undoubtedly, that is why the
18 investment structure utilizes indentured trustees and
19 authorizes indentured trustees to take actions on behalf of
20 the large number of investors.

21      The bankruptcy process allows creditors and debtors to
22 resolve disputes.  The creditors of this debtor are
23 Wilmington Bank and U.S. Bank, indentured trustees of the
24 statutory trust which holds the debenture of the debtor.
25 Hildene may have an economic interest in the resolution of

7

```
 1   the bankruptcy process, but not every entity with such an
 2   interest becomes a party in interest.  Neither Hildene, Zion
 3   National, nor Deutsche Bank are parties in interest under
 4   1109(b).
 5        So, that is the conclusion.  And, counsel, as I
 6   ordinarily do, I will offer to file--  sign and file
 7   essentially a one-sentence order that simply states that
 8   standing to appear is not granted to these three entities
 9   based upon the oral decision.  If any of the counsel wish
10   something more elaborate than that, then they have to
11   prepare the order themselves.  So, does any counsel want to
12   prepare the order?
13        Hearing nothing, it appears as though we will do the
14   standard form, two-sentence order, and I guess I will be
15   seeing most of you this afternoon at 2:00 o'clock.  All
16   right.  You all have a good day.
17        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.
18        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.
19                          (End of hearing 9:18 a.m.)
20
21
22
23
24
25
```

10-06097-PCW11   Doc 140   Filed 11/27/10   Entered 11/27/10 08:18:00   Pg 8 of 9

```
1   STATE OF WASHINGTON )
                        :        C E R T I F I C A T E
2   County of Spokane   )

3

4          I, SHERRIE T. WRIGHT, a notary public in and for

5   the State of Washington, do hereby certify, under penalty of

6   perjury:

7

8          That the foregoing Court's Oral Ruling was taken

9   on the date and at the time and place as shown on the Title

10  Page hereto;

11         That I am in no way related to or employed by any

12  party in this matter, nor to any counsel, nor do I have any

13  interest in this matter;

14         That the foregoing is a true and correct

15  transcription, to my best ability to hear the audio

16  equipment transcribed by me or under my direction.

17

18         WITNESS my hand and seal this 18th day of November,

19  2010.

20

21                          _____/s/ Sherrie T. Wright_____
                            NOTARY PUBLIC in and for the State
22                          of Washington, residing at Spokane
                            My commission expires:  5/20/12
23

24

25
```

9



Mark I. Duedall
Direct: 404-572-6611
Fax: 404-420-0611
Mark.Duedall@BryanCave.com

**Bryan Cave LLP**
One Atlantic Center
Fourteenth Floor
1201 W. Peachtree St., NW
Atlanta, GA 30309
Phone (404) 572-6600
Fax (404) 572-6999
www.bryancave.com

**Bryan Cave Offices**

Atlanta
Boulder
Charlotte
Chicago
Colorado Springs
Dallas
Denver
Frankfurt
Hamburg
Hong Kong
Irvine
Jefferson City
Kansas City*
London
Los Angeles
New York
Paris
Phoenix
San Francisco
Shanghai
Singapore
St. Louis
Washington, DC

**Bryan Cave
International Consulting**
*A TRADE AND CUSTOMS CONSULTANCY*

www.bryancaveconsulting.com

Bangkok
Beijing
Jakarta
Kuala Lumpur
Manila
Shanghai
Singapore
Tokyo

March 20, 2013

## Via Email and Via U.S. First Class Mail

Ethan A. Brecher
Law Office of Ethan A. Brecher, LLC
600 Third Avenue - 2nd Floor
New York, NY 10016

     Re:    *In re Premier Bank Holding Company*, and the Rule 2004
            Efforts by Hildene

Dear Ethan:

I am writing in the event your client, Hildene Debt Solutions, Inc. or any of its affiliates (collectively, "***Hildene***"), seek to renew any efforts to pursue Rule 2004 discovery as to the Debtor. On the record last week, as I have indicated to you repeatedly since you and I first spoke just after Christmas of 2012, I set forth again that Mr. Brown still has no contract or long-term employment arrangement with Centennial Bank or Home BancShares, Inc. As of the closing, he became an at-will employee for Centennial, and remains such. There was never a secret deal, or an open deal, or any deal **whatsoever**. Mr. Brown testified, in open court at the start of the case, that he expected to keep working for the buyer post-sale. He testified that no contract or employment agreement was contemplated. He testified that he expected such employment to be market terms, but those terms had not been negotiated. Transcript of Hearing of Sept. 6, 2012, at pp. 47-48. And indeed, this has happened. His employment is and remains at-will, on a day-by-day basis. Moreover, he has done so with a substantial **decrease** in pay and benefits, and no bonus or incentive plan. And further, this is on top of the substantial monetary contributions he made for the benefit of Premier Bank and the Debtor, as set forth in his first-day affidavit. This is not a case of a "sweetheart deal," for Mr. Brown or for anyone else. Hildene's accusations are patently false, defamatory, and evidence of character assassination. I have indicated this to you again and again, and we once again put this in the record in the bankruptcy case last week.

If Hildene persists in seeking Rule 2004 relief on such matters, the Debtor will seek sanctions against Hildene and your firm, pursuant to Bankruptcy Rule 9011, 28 U.S.C. § 1927, and any other applicable law. Indeed, this is one of the few instances where a Rule 2004 motion by Hildene would violate every single part of Bankruptcy Rule 9011(b):

- Such a motion would only be intended to harass the individuals involved, in violation of Bankruptcy Rule 9011(b)(1). Specifically, I believe the evidence would show that Hildene's actions are to show other banks, and their advisors, and their executives, and their potential buyers, that no one can cross Hildene and get away with it.

- The claims and legal contentions would not be warranted by existing law, in violation of Bankruptcy Rule 9011(b)(2). I do not know of a single case where a party such as Hildene had every opportunity to object to a sale, take part in the sale, take part in discovery, raise issues with the Court — yet did nothing, and still would be allowed to challenge the factual underpinnings of the sale.

- Such a motion would have no evidentiary support, in violation of Bankruptcy Rule 9011(b)(3). None at all.

- Finally, Hildene has heard, throughout this case, that the insiders of the Debtor would gain nothing from this transaction — except, perhaps, for some of them, a job on terms to be determined (and, as it turned out in the case of Mr. Brown, on terms that were less favorable than those in place for Premier Bank). Hildene has no evidence to deny these facts, or any basis to state its lack of knowledge as to these facts. Any efforts or statements by Hildene to the contrary would violate Bankruptcy Rule 9011(b)(4).

All rights are reserved as to the Debtor's remedies for Hildene's prior Rule 2004 motion, and the substantial costs it imposed on the Debtor's Estate and creditors. I will be discussing things with the appropriate parties and will let you know in advance if the Debtor seeks to take action against Hildene for Hildene's

prior Rule 2004 motion, and the substantial cost that Hildene imposed on the bankruptcy estate to the detriment of all creditors. But certainly, for any future actions by Hildene on this front, you and Hildene are now on full notice.

Very Truly Yours,

Mark I. Duedall

cc:   Mary Gill
Sage Sigler
Michael Riela
Brian Rich
Jason Burnett
G. Matthew Brown
Shane Ramsey
Marie Pollio
Robert Bruner
Ira Goldman
Vik Ghei